CARMEN ARIAS, demandante y apelante, *v.* CARMEN TORRES CÓRDOVA DE LUFF y TOMÁS LUFF, demandantes y apelados.

Número 11172.

*Sometido:* 9 de agosto de 1954. *Resuelto:* 29 de abril de 1955.

188

(EN MOCION DE RECONSIDERACION)

EL JUEZ PRESIDENTE SEÑOR SNYDER emitió la opinión del Tribunal.

La demandante-apelante ha radicado una moción para que reconsideremos nuestra opinión *per curiam* y la sentencia dictadas en el caso de epígrafe el 17 de mayo de 1954, confirmando la sentencia del Tribunal Superior a favor de los demandados. La opinión *per curiam* dice como sigue:

"La demandante instó pleito en cobro de dinero ante el Tribunal Superior en contra de los demandados. Luego de un juicio en los méritos, el tribunal sentenciador dictó sentencia a favor de la demandante. Sin embargo, después de haber los demandados radicado una moción de reconsideración y proporcionarle al tribunal la transcripción de evidencia, éste dejó sin efecto su primera sentencia y dictó una nueva a favor de los demandados.

"En apelación el único error señalado por la demandante es el siguiente:

" 'El Tribunal Superior, Sala de San Juan, por medio de su Hon. Juez Rodolfo Ramírez Pabón cometió error manifiesto en su sentencia de Enero 13, 1953, siendo la sentencia aquí apelada contraria a la prueba y además contraria a la Ley.'

"Éste es un caso en que hubo un patente conflicto en la evidencia. El resultado depende de si la demandante o la demandada Carmen Torres decían la verdad en sus respectivos testimonios sobre la transacción que ambas efectuaron. Se admite por ambas partes que a principios del mes de agosto de 1949, la demandante entregó a la demandada Carmen Torres, en tres sumas diferentes y en tres ocasiones distintas, la suma de $4,334. La demandante declaró que ella le prestó este dinero a Carmen Torres, sin intereses, por varios días que vencerían el 31 de agosto de 1949, y que en esta última fecha Carmen Torres le entregó a la demandante tres cheques ascendentes a $4,805, los

cuales fueron devueltos por el banco por insuficiencia de fondos. Por otro lado, la demandada declaró que ella conoció a un señor Elías Lopés que tomaba dinero a préstamo y pagaba intereses crecidos, que ella hizo negocios con él, prestándole su propio dinero, y se lo recomendó a sus amigas, que fué Carmen Arias quien la llamó para entregarle el dinero para que se lo colocara con Lopés, que antes de las entregas de dinero de agosto del 1949, Carmen Arias en muchas ocasiones le había entregado dinero para que lo colocara con Lopés, y Lopés lo había pagado, con intereses, que Carmen Torres nada ganaba en estas operaciones que hacía para su amiga, que Lopés solía dar un documento como recibo, pero que a veces el documento se tardaba y entonces ella, Carmen Torres, daba esos cheques. Los cheques los dió ella, no en 31 de agosto, sino en 3 de agosto, 10 de agosto y 5 de agosto, es decir, las tres fechas de 1949 en que Carmen Arias le entregó el dinero que nunca se pagó, que no se pagó ese dinero porque en esa época fué que Lopés desapareció y cuando reapareció fué 'para celebrársele juicio'.

"En adición a los tres cheques, la demandante identificó y los demandados luego presentaron en evidencia, un papel, la mayor parte del cual está en letra grande, y el cual la demandante identifica como suya, y el resto en letra pequeña, que la demandante identificó como letra de la demandada Carmen Torres. En este escrito las palabras 'intereses' y 'capital' fueron escritas *por la demandante*. El papel aparentemente demuestra que la demandante había hecho un préstamo a la demandada de $4,334 y recibiría $4,805 en menos de un mes, y que la diferencia de $471 eran intereses. (Esto desde luego sería usurario.) La demanda originalmente era por $4,805, incluyendo intereses, aunque durante el juicio la demandante solicitó permiso, que le fué concedido, para enmendar la demanda a fin de solicitar sólo la cantidad de $4,334.

"Los autos contienen suficiente evidencia para sostener la conclusión del tribunal sentenciador al efecto de que la demandada Carmen Torres no tomó a préstamo suma alguna de la demandante, sino que recibió el dinero como intermediaria—en efecto legal, como agente—a fin de colocarlo a préstamo con Elías Lopés, y que los cheques expedidos a favor de la demandante eran una especie de constancia o recibo que la demandada Carmen Torres entregaba a la demandante cuando el documento de Lopés por cada préstamo héchole 'no venía a tiempo'. Por con-

siguiente no intervendremos con las conclusiones de hechos de la corte sentenciadora a este respecto.

"La sentencia del Tribunal Superior será confirmada."

■ Cuando emitimos la anterior opinión *per curiam* descansamos desde luego en la conclusión del tribunal sentenciador al efecto de que Carmen Torres había dicho la verdad en cuanto a la transacción efectuada entre ella y la demandante. El tribunal sentenciador dijo—al arribar a dicha conclusión— que había ". . . dado el debido peso a la circunstancia de que la demandante se apartó de la verdad respecto a una parte pertinente de su declaración, es decir, negó persistentemente que el préstamo hecho por ella devengara intereses algunos, cuando la prueba, especialmente la documental, de puño y letra de la propia demandante, demuestra que el préstamo que convino la demandante fué a base de intereses, y de intereses usurarios." Opinamos que, bajo todas las circunstancias concurrentes, el tribunal sentenciador tenía derecho a apreciar la evidencia en esta forma. En adición a las cifras escritas por la propia demandante en el papel que se presentó en evidencia, los cheques expedidos por Carmen Torres y la demanda original radicada en este caso por la demandante, son en ambos casos por $4,805, suma que incluye los intereses usurarios. Estos documentos tienden a desacreditar la versión de la demandante de que el convenio entre las partes fué que cuando la demandante hiciera efectivos los tres cheques, ésta le reembolsaría a Carmen Torres la cantidad incluída como intereses. Y si este aspecto del testimonio de la demandante—que se trajo para contrarrestar la posible defensa de usura—no fuese cierto, el tribunal sentenciador tenía derecho a tomar dicho hecho en consideración al determinar si daba crédito a la demandante en cuanto a que el préstamo fué hecho a Carmen Torres o si daba crédito a ésta de que ella era meramente un agente de la demandante para hacerle un préstamo usurario a un tercero.

Puede ser que el tribunal sentenciador creyera la versión de Carmen Torres sobre la transacción entre ella y la deman-

dante porque el testimonio de ésta era improbable en otros extremos. La demandante declaró que si bien ella y Carmen Torres eran viejas amigas y Carmen ". . . es una persona trabajadora y honorable y buena. . .", a la demandante no le interesó y no averiguó para qué quería Carmen Torres el dinero, el cual representaba los ahorros de toda la vida de la demandante. También declaró que si bien la demandante había visitado a Carmen Torres varias veces tratando de cobrarle el dinero, ésta nunca le explicó por qué no le podía pagar. Es difícil que una persona preste sus ahorros de toda la vida a una amiga sin averiguar la razón por la cual ella necesita el dinero. También es improbable que una vieja y honorable amiga no le explicase por qué no le podía pagar. Bajo estas circunstancias aparentemente pareció más plausible a la corte sentenciadora (1) que el motivo para la entrega del dinero por la demandante a Carmen Torres fué que ésta actuaba como agente de la primera para hacerle un préstamo con intereses usurarios a un tercero, y (2) que la explicación del no pago del préstamo fué que el tercero tomó el dinero y desapareció. Por consiguiente, el tribunal sentenciador no dió crédito al testimonio de la demandante al efecto de que porque confiaba en Carmen Torres, la demandante no obtuvo recibos de ésta por los préstamos que ella le hizo a Carmen en tres ocasiones en el mes de agosto de 1949, y que los tres cheques firmados por Carmen Torres se le entregaron a la demandante el 31 de agosto de 1949 como pago a la demandante por tales préstamos. Por el contrario, el tribunal sentenciador dió crédito al testimonio de Carmen Torres de que los tres cheques, si bien fechados el 31 de agosto de 1949, le fueron entregados por ella a la demandante por separado en cada ocasión en que ella recibiera dinero de aquélla como recibos por los préstamos que ésta le hacía a un tercero por medio de Carmen Torres actuando como agente suyo. Reiteramos lo que dijimos en nuestra opinión *per curiam* de que nada encontramos en los autos que nos permita intervenir con las conclusiones de hechos del tribunal sentenciador en este caso.

■ En su moción de reconsideración la demandante insiste en dos cuestiones legales. Primero, sostiene que bajo la Ley de· Instrumentos Negociables los cheques expedidos por Carmen Torres a la demandante constituyen contratos para pagarle el dinero en controversia y que los demandados no tienen derecho a probar que dichos cheques eran como cuestión de hecho unos recibos. Si estos cheques estuvieran en manos de un tenedor de buena fe, los demandados no podrían alegarle a aquéllos que los mismos constituían de hecho recibos y no cheques. Pero la demandante es la supuesta tomadora. Y entre el librador y el tomador de un cheque, bajo las circunstancias de este caso, la libradora puede demostrar de serle posible mediante evidencia competente que el instrumento fué de hecho un recibo y no un cheque en virtud de un convenio colateral entre la libradora y la tomadora. Esto no infringe la regla sobre evidencia oral. Resolver lo contrario equivaldría a cerrarle las puertas a prueba traída por los demandados sobre un intento de fraude de parte de la demandante.[1] 3 Williston, *Contracts*, ed. revisada, sec. 644, págs. 1853 et seq.; IX Wigmore, *Evidence*, 3ra. ed., sec. 2438, pág. 122; 1 *Restatement, Contracts*, sec. 240, *Comment b*, pág. 336, y *Comment on Subsection (1b)*, págs. 337–8; Britton, *Bills and Notes*, págs. 570 et seq.; *Bigas* v. *Monforte*, 76 D.P.R. 309; *Annotation*, 20 A.L.R. 421, 54 A.L.R. 702, 105 A.L.R. 1346. *Cf.* II *Restatement, Agency*, sec. 324, *Illustration* 1, en cuanto a la admisibilidad de evidencia oral para modificar un instrumento negociable; *Annotation*, 75 A.L.R. 1519. Véanse también, 13 L.R.A. 649; 43 L.R.A. 449; 128 Am. St. Rep. 609; *Davis* v. *Davis*, 36 S.E.2d 417 (W. Va., 1945); *Clarke* v. *Clarke*, 152 P.2d 908 (Okla., 1944); *Vincent* v.

---

[1] Como hemos visto, dicha prueba consistió en que—usando cheques expedidos por Carmen Torres a la orden de la demandante, pero que por convenio de las partes serían recibos por dinero que la demandante entregó a Carmen Torres para que ésta a su vez entregara a un tercero en calidad de préstamos de la demandante a dicha tercera persona—la demandante trataba de cobrarle a Carmen Torres y a su esposo los préstamos usurarios que aquélla de hecho hiciera a un tercero a través de Carmen Torres en calidad de agente de la demandante.

*Russell*, 201 Pac. 433 (Ore., 1921) ; *Brook* v. *Latimer*, 24 Pac. 946 (Kan., 1890). (²)

■ La segunda contención hecha en reconsideración por la demandante es que ". . . la mera declaración de un alegado agente no puede establecer agencia *a menos que haya corroboración* con otra evidencia o que haya aceptación o admisión por parte del alegado principal y por tanto la declaración de Carmen Torres de Luff en la corte inferior no es admisible ni puede ser considerada para los efectos de pesar la evidencia para dar o no credibilidad a la misma." La demandante descansa en *Maceira* v. *Pietri et al.*, 30 D.P.R. 587; *Fuentes* v. *Canetty*, 39 D.P.R. 173; *Cayuga* v. *Crédito y Ahorro Ponceño*, 41 D.P.R. 457; *Fajardo* v. *Schlüter & Co., Sucr.*, 43 D.P.R. 276; y *Pol* v. *Suau, Fiol & Co.*, 44 D.P.R. 71.

Estos casos no sostienen, como parece creer la demandante, la proposición de que el testimonio de un supuesto agente—según éste se distingue de sus manifestaciones extrajudiciales— o es inadmisible o debe ser corroborado. Por el contrario, los casos de *Fajardo* y de *Cayuga* expresamente resuelven lo contrario. En el caso de *Fajardo* dijimos a la pág. 277:

"Convenimos con el apelante en que la corte de distrito estaba equivocada al resolver que la declaración de un agente no es por sí sola suficiente prueba de la agencia. *El Pueblo* v. *South Atlantic Fruit Co.*, 25 D.P.R. 665, y *Quintana Reyes* v. *Lejeune*, 37 D.P.R. 733, no resuelven tal cosa. En *Cayuga* v. *Crédito y Ahorro Ponceño*, 41 D.P.R. 457, tuvimos ocasión de corregir un error relativo a la misma cuestión. En otras palabras, la regla es que las declaraciones hechas a otras personas no son admisibles, pero que el testimonio del agente mismo podría tender a probar la agencia. . . ."

(²) La demandante descansa en los arts. 538, 377 a 379, 404, 413, 414 y 436 del Código de Comercio, ed. de 1932, que constituyen algunas de las disposiciones de la Ley de Instrumentos Negociables; *Note*, 21 L.R.A. (N.S.) 704; 2 Daniel, *Negotiable Instruments* sec. 1646; *Economy Fuse & Mfg. Co.* v. *Standard Electric Mfg. Co.*, 194 N.E. 922 (Ill., 1935); *Camas Prairie State Bank* v. *Newman*, 99 Pac. 833 (Ida. 1909); *Deal* v. *Atlantic Coast Line R. Co.*, 144 So. 81 (Ala., 1932) ; 5 R.C.L. págs. 478 *et seq.* Nada encontramos en estas autoridades que sostenga la posición de la demandante en este caso.

En el de *Cayuga* expusimos la doctrina correcta a las págs. 461–2 como sigue:

"Ahora bien, aunque existe un principio general de derecho, de que las declaraciones de un agente no son admisibles para probar la agencia, es aplicable solamente a las declaraciones hechas fuera de la corte cuando son citadas por otra persona, y un agente es de todo punto competente para declarar respecto a su agencia, aunque el peso de su declaración es una cuestión distinta, especialmente con respecto al límite de la agencia. Que un agente puede declararlo así es una conclusión que puede derivarse de las siguientes autoridades: *Bender et al.* v. *Ragan et al.*, 102 Pac. 427; *Yoslyn* v. *Cadillac Automobile Co.*, 177 Fed. 863; 2 C. J. 933, donde se dice:

" 'La regla de que las manifestaciones de un agente son, en lo que a su principal concierne, inadmisibles para probar el hecho de la agencia, no es aplicable a su declaración como testigo en un juicio en que tal hecho está en controversia.'

"Quizás en algunas de nuestras opiniones no hayamos hecho esta distinción tan cuidadosamente como debió hacerse, porque hasta ahora la cuestión no había estado directamente envuelta. Por ejemplo, en el caso de *Orange Rice Milling Co., demandante y apelada*, v. *Angel Barasorda, demandado y apelante, fallado el 31 de enero, 1930*, dijimos:

" 'Fuera del principio general de que una agencia no debe establecerse por la sola declaración del agente, los autos en su totalidad no demuestran que existiera esa agencia.'

"Ese caso, sin embargo, no giró sobre el hecho de la agencia, sino sobre el alcance de la misma, y lo dicho, en cuanto era aplicable a la declaración del agente en el mismo, fué un mero *obiter dictum*." (3)

En el caso de *Pueblo* v. *Compañía Insular de Transporte, Inc.*, 46 D.P.R. 596, que la demandante no cita, dijimos a la pág. 597: "La apelante funda su primer motivo de error en que la declaración del *chauffeur* del *truck* es inadmisible para

(3) De igual manera, el *dictum* en *Fuentes* v. *Canetty*, supra, 176, al efecto de que "...la declaración de un agente no es prueba de la agencia..." es erróneo; el mismo no se ajusta ni a nuestros casos ni a los de otras jurisdicciones.

Los casos de *Maceira* y de *Pol* nada tienen que ver con éste. El primero meramente resuelve que el testimonio en él envuelto no demostró

probar la relación de principal y agente; pero en los casos de *Cayuga* v. *Crédito y Ahorro Ponceño*, 41 D.P.R. 457, y de *Fajardo* v. *Schlüter & Co., Sucr.*, 43 D.P.R. 276, resolvimos que la agencia puede probarse por el testimonio en juicio del agente; regla de evidencia que también es aplicable en lo criminal." *Cf.* art. 397, párr. 5, Código de Enjuiciamiento Civil, ed. de 1933.

La doctrina sentada en nuestros casos está de acuerdo con la de otras jurisdicciones. "La regla de que 'las declaraciones de un agente no son admisibles para probar la existencia de una agencia,' se refiere exclusivamente a declaraciones hechas por el agente fuera de la sala del tribunal, ya que es regla bien establecida que cuando el agente ocupa la silla testifical, éste puede declarar lo que su principal le dijo que hiciera, y mediante tal testimonio puede establecer la existencia de la agencia. . . ." *Annotation*, 3 A.L.R.2d 598, 599; 2 *Restatement, Agency*, sec. 285 (*a*), pág. 642; IV Wigmore, *Evidence*, sec. 1078, pág. 125, y *1953 Pocket Supp.*, págs. 51–2, citando numerosos casos estatales, incluyendo los de *Pueblo* v. *Compañía Insular de Transporte, Inc.*, supra; *Posko* v. *Climatic Control Corp.*, 84 A.2d 906, 909 (Md., 1951); *Stern* v. *Dekelbaum*, 34 A.2d 272, 273 (Pa., 1943); *Shama* v. *United States*, 94 F.2d 1, 5 (C.A. 8, 1938); *Montgomery Production Cred. Ass'n* v. *M. Hohenberg & Co.*, 12 So.2d 865 (Ala., 1943); *Commercial Solvents* v. *Johnson*, 69 S.E.2d 716 (N.C., 1952); *Johnson* v. *Associated Seed Growers*, 3 N.W.2d 332 (Wis., 1942); *Bregman Screen & Lumber Co.* v. *Bechefsky*, 83 A.2d 804 (N.J., 1951); *Freeborn* v. *Davis*, 122 S.W.2d 645 (Tex., 1938); 23 U.Cin.L.Rev. 269 (1954); 37 Mich.L.Rev. 784; 47 Col.L.Rev. 1227; 60 Harv.L.Rev. 976. *Cf.* 2 Morgan, *Basic Problems of Evidence*, págs. 235–7; Regla 508, *Model Code of Evidence; Annotations*, 150 A.L.R. 623, 80 A.L.R. 604.

"mediante prueba positiva" que un agente tuviera autoridad para obligar a su principal en un arrendamiento durante un número de años. En el segundo indicamos que en dicho caso el testimonio de un supuesto agente había sido de hecho corroborado; pero en ningún momento dijimos que tal corroboración era necesaria como cuestión de derecho.

■ En vista de lo anteriormente expuesto, era admisible en evidencia el testimonio de Carmen Torres estableciendo en detalle que ella no cogió prestado para sí el dinero aquí envuelto sino que de hecho actuaba como agente de la demandante para hacerle un préstamo a un tercero. Y su declaración, en unión a la evidencia documental y a las otras circunstancias de este caso, fueron suficientes para sostener la sentencia del tribunal sentenciador a favor de los demandados.

*Por los motivos ya expuestos, se declarará sin lugar la moción de reconsideración radicada por la demandante.*

El Juez Asociado Sr. Sifre no intervino.

Opinión disidente del Juez Asociado Señor Belaval con la cual concurre el Juez Asociado Señor Negrón Fernández.

Este es un caso muy sencillo que han logrado complicar bastante los peritos de la ley. En el mes de agosto de 1949, doña Carmen Torres Córdova de Luff obtuvo de doña Carmen Arias ciertos préstamos de dinero para aquélla prestárselos a su vez a don Elías Lopés.

El primer indicio claro de la situación lo encontramos en las alegaciones radicadas por las partes. En su demanda, la demandante doña Carmen Arias, alegó los siguientes hechos:

"2. Alega la demandante que con anterioridad a la fecha de la radicación de esta demanda y durante los meses anteriores a agosto 31 de 1949, la demandada Carmen Torres Córdova de Luff tomó a préstamo de la demandante la suma de Cuatro mil ochocientos cinco dólares (4,805), comprometiéndose a pagarlos el día 31 de agosto de 1949, lo que no ha hecho hasta la fecha ninguno de los demandados a pesar de los requerimientos que la demandante les ha hecho personalmente y por medio de su abogado que suscribe.

"3. Alega la demandante que para garantizar el pago de dicha suma de dinero la demandada Carmen Torres Córdova de Luff expidió tres cheques bajo su firma contra el Crédito y Ahorro Ponceño, sucursal de San Juan, con fecha 31 de agosto de 1949, pagaderos a la demandante por las sumas de $3,080,

$1,195 y $530, y habiendo sido presentados dichos cheques para su cobro en 8 de septiembre de 1949, no fueron honrados en dicho banco por carecer de fondos ·suficientes la demandada."

Contestando dichas alegaciones, los demandados formularon las siguientes defensas especiales:

"1. Los demandados alegan que la demandante utilizó a la demandada Carmen Torres Córdova de Luff como intermediaria para que le colocara con una tercera persona y en calidad de préstamo cierta cantidad de dinero.

"2. Que la demandante le exigió como recibos por dicha cantidad de dinero a la demandada Carmen Torres Córdova de Luff unos cheques que fueran única y exclusivamente sustitutos de recibos pero no cheques a presentarse y cobrarse, ya que a la demandante le constaba que la demandada no tenía cuentas en el banco para honrar dichos cheques.

"3. Que la demandante cobraba y cobró intereses usurarios por la cantidad de dinero que, como intermediaria entregó a la demandada para depositarlos en préstamos.

"4. Que los demandados no adeudan a la demandante la cantidad alegada en la demanda, ni cantidad otra alguna mayor o menor de dinero."

De estas alegaciones se desprende claramente cuál fué la posición adoptada por cada parte para ventilar la cuestión litigiosa. La demandante alegó que "la demandada Carmen Torres Córdova de Luff *tomó a préstamo* de la demandante la suma de cuatro mil ochocientos cinco dólares ($4,805) comprometiéndose a pagarlos el día 31 de agosto de 1949, lo que no ha hecho hasta la fecha." Los demandados alegaron: (1) que la demandante utilizó a la demandada Carmen Torres Córdova de Luff como intermediaria *para que le colocara con una tercera persona* y en calidad de préstamo cierta cantidad de dinero; (2) que la demandante exigió "como recibos por dicha cantidad de dinero a la demandada Carmen Torres Córdova de Luff unos cheques que fueran única y exclusivamente sustitutos de recibos"; (3) "que la demandante *cobraba y cobró intereses usurarios* por la cantidad de dinero que, como intermediaria entregó a la demandada *para depositarlos en*

*préstamos;* (4) "que los demandados no adeudan a la demandante la cantidad alegada en la demanda, ni cantidad otra alguna mayor o menor de dinero."

Durante la celebración de la vista del caso, el abogado de la demandante en dicha vista, señor Harry M. Besosa anunció la teoría de su prueba mediante las siguientes palabras: "señor Juez, la teoría de la demandante es la siguiente: que allá para agosto de 1949 la demandante prestó a la demandada $4,334 en tres diferentes partidas dentro del mes de agosto del cuarenta y nueve. Que a fin de agosto del cuarenta y nueve la demandada le entregó a la demandante en pago de esas deudas tres cheques, y dichos cheques, al presentarse en los bancos, no tenían fondos y que, por tanto, dicha cantidad es adeudada en total."

El abogado de la demandada en dicha vista señor Jorge Luis Córdova Díaz, anunció la teoría de su prueba mediante las siguientes palabras: "la teoría de la demandada es la siguiente, señor Juez. Que eso no fué un préstamo. *Eso fué una agencia* mediante la cual la demandante entregó a la demandada *para que la demandada lo invirtiera,* o sea, lo prestara a determinada persona, cosa que la hizo; y el préstamo se perdió. Este es un caso que es una secuela del asunto de que quizás la corte tenga conocimiento, de un señor Lopés y un tal Lube Sierra" . . . . .

Abogado de la Demandante: "Nos vamos a oponer a eso. No hay alegaciones para sustentar esa teoría."

Abogado de la demandada: "Muy bien. *No tenemos mucho interés sobre ese aspecto.* De todas maneras esa es la teoría de la demandada."

Como se ve, la teoría de las alegaciones de los demandados de la intermediaria oficiosa se cambia antes de la vista del caso, en la de agencia (entiéndase mandato).

El caso empezó con un requerimiento del abogado de la demandante:

Abogado de la demandante: "Voy a solicitar del abogado de la demandada que me facilite un documento que él me

mostró ayer en su oficina a virtud de una solicitud de inspección de documentos . . . ."

Abogado de la demandada: "Sí, se lo entrego al compañero".

Abogado de la demandante: "para identificarlo, señor Juez. Que se marque como identificación".

Juez: "Se marca exhibit de identificación 1 de la parte demandante."

Veamos ahora, lo que declaró la demandante:

"Demandante:
"Pregunta: ¿Su nombre?
"Testigo:
"Respuesta: Carmen Arias Andréu.
"P.   ¿Dónde trabaja usted, señora?
"R.   En el Departamento del Interior.
"P.   ¿Conoce a la demandada doña Carmen Torres Córdova de Luff?
"R.   Toda mi vida la he conocido.
"P.   ¿Hasta los momentos de esta transacción ustedes eran o no eran amigas?
"R.   Eramos amigas de la infancia.
"P.   Dígame, doña Carmen—mostrándole a la testigo el documento marcado identificación 1—¿ese papel que le muestro por quién está escrito en parte?
"R.   Esta es mi letra.   Todo esto.
"P.   ¿Conoce la letra grande?   ¿Es suya?
"R.   Sí, la letra grande.
"P.   ¿Y la letra pequeñita?
"R.   Esa no.
"P.   ¿De quién es esa letra?
"R.   De la señora.
"P.   ¿De la señora demandada?
"R.   Supongo, porque yo no la he escrito.
"P.   *¿Pero la letra grande es suya, o sea, las numeraciones esas son suyas?*
"R.   Sí, señor.
"P.   Entonces, señora Arias ¿en agosto del cuarenta y nueve qué sucedió entre usted y la señora Torres Córdova de Luff?
"R.   *La señora Torres Córdova me solicitó dinero.*

"P.   ¿Con qué fin?

"R.   ¿Con qué fin?

"P.   ¿En préstamo?

"R.   *Me solicitó dinero—que se lo prestara, que se lo diera.*

"P.   ¿Y qué hizo usted?   ¿Usted le dió entonces qué cantidad?

"R.   Le di distintas cantidades.

"P.   ¿La primera cantidad que le dió cuánto fué?

"R.   La primera cantidad que le di, $1,062.

"P.   ¿Mil sesenta y dos dólares?

"R.   Sí, señor.

"P.   ¿Y después volvió y le dió alguna otra cantidad dentro de ese mes?

"R.   Sí, señor.   En el trayecto del mes de agosto le di $2,772.

"P.   ¿Y después, dentro de ese mes le dió alguna otra cantidad más?

"R.   Sí: quinientos dólares.

"P.   ¿Que hacían un total de . . .?

"R.   De $4,334.

"P.   ¿Ese dinero para ser pagado cuándo?

"R.   El 31 de agosto.

"P.   ¿De ese mismo año?

"R.   Sí, señor.

"P.   *¿Qué sucedió el 31 de agosto de ese mismo año?*

"R.   *Ella me entregó los cheques.   Yo fuí a cobrarlos y no tenía dinero.*

"P.   *¿Le entregó cheques a usted?*

"R.   *Sí, pero alterados.   No con las mismas cantidades.*

"P.   Mostrándole a la testigo tres cheques de agosto 31 de 1949: uno por la cantidad de $530, otro por la cantidad de $1195 y otro por la cantidad de $3080, que aparecen firmados por Carmen Luff y que tienen atachada una nota del Banco Crédito y Ahorro Ponceño, Sucursal de San Juan, de septiembre 8 de 1949—*'no tiene fondos suficientes'*—¿qué es esto?

"R.   Los cheques que ella me dió.

"P.   ¿Usted recibió esos cheques a satisfacción o le indicó usted algo?

"R.   No los recibí a satisfacción *porque estaban alterados en más de lo que yo le había dado a ella.*   Yo le dije que cobraría el dinero que yo le había dado a ella y devolverle el resto a ella.

"P.  ¿Este cheque de $530 tenía una cantidad de más?

"R.  Sí.  Ella me dijo que le quitara lo más,. los treinta dólares.

"P.  ¿Y al de $1195 que le quitara cuánto?

"R.  Que le quitara ciento diez y ocho pesos.

"P.  ¿Y usted había escrito eso. en ese papel?

"R.  Sí, ella me dijo también que.se lo hiciera.

"P.  ¿Y en el de $3080?

"R.  Sí, que le quitara trescientos ocho, para pagarle el capital.

"P.  ¿Y usted fué poniendo eso en ese papel?

"R.  Sí.  El capital que yo le di a ella fué de $4,334.

"P.  ¿Y qué pasó con estos cheques?

"R.  *Que no tenía fondos.*

"P.  *¿Usted se iba a quedar con todo ese dinero?*

"R.  *Con el que me pertenece a mí,. y devolverle el resto a ella.*

"P.  ¿Cuánto?

"R.  *Cuatrocientos y pico de pesos.*

"P.  *¿La diferencia que ella le dijo en ese papel?*

"R.  *En ese papel.*

"P.  ¿Y por qué ella le daba a usted ese dinero que está escrito en ese papel?

"R.  Pues me dijo que le descontara eso.

"P.  ¿Y lo que usted iba a recibir cuánto era?

"R.  Pues lo que yo le di a ella nada más; y devolverle el más mínimo chavo.

"P.  ¿Y usted presentó este cheque al banco?

"R.  Sí, señor.

"P.  ¿Y tenía fondos?

"R.  *Me dijeron que no tenía suficientes fondos.*

"P.  ¿En alguna ocasión después de esto, se le han pagado a usted estas cantidades?

"R.  Absolutamente, ni un centavo.

"P.  ¿Se le debe totalmente la cantidad de $4,334?

"R.  Sí, señor.

"P.  *¿En alguna ocasión usted le cogió, le cobró dinero a ella por interés, en alguna ocasión?*

"R.  *Nunca, absolutamente.*

"P.  *¿Anteriormente ella le había cogido dinero a usted, en otras ocasiones?*

"R.  *Sí, siempre.*

"P.   ¿Se lo había devuelto?

"R.   Sí, me lo había devuelto.

"Demandante:   Nada más, señor juez.

"Para ofrecer los cheques con la nota del banco.

"Demandada:   No hay objeción.

"Juez:   Se admiten.     Y se marcan exhibit I, en conjunto.
"(t 2–7)"

Contrainterrogada por el abogado de la demandada, contestó de la siguiente manera:

"Demandada:

"P.   ¿Usted ha oído nombrar a unos individuos: Elías Lopés y un señor Lube Sierra?

"R.   No, bueno, cómo no, los he oído nombrar porque leí en el periódico las cosas de ellos.

"P. ¿Sabe si tienen que ver con este asunto?

"R.   No, señor, no tienen que ver nada.

"P.   ¿Usted sabe que no tienen nada que ver con este caso?

"R.   Absolutamente nada.

"Demandante:   Me opongo, señor juez.   Este es un préstamo a esta señora demandada.   No veo por qué tienen que traer aquí relación de otras personas que nada tienen que ver con la transacción en este caso.   No se ha declarado sobre eso en la directa y ahora viene la parte demandada y quiere inyectar esta premisa dentro de este interrogatorio.

"Demandada:   Es que yo quiero demostrar que la testigo sabía para qué era el dinero.

"Juez:   Se admite la pregunta.

"Demandada:

"P.   ¿Su contestación, señora, es que usted sabe que Lopés y Lube Sierra no tienen que ver nada con este asunto?

"R.   Bueno, yo le digo a usted que sí, que ellos no tienen que ver con eso porque yo le entregué mi dinero a Carmen Torres.

"P.   ¿Para qué?

"R.   Para qué no sé.   Ella iba a mi casa a pedirme el dinero. Tan es así que los cheques que tengo son de Carmen Torres de Luff.

"P.   ¿Usted no sabe para qué quería ella ese dinero?

"R.   No sé.   Y ni me interesaba para qué lo quería ella.

"P.   ¿Usted no sabe que ella tiene negocios?

"R.   Sí, yo sé que es una persona trabajadora y honorable y buena; pero no sé . . .

"P.   ¿Pero no sabía para qué ella necesitaba el dinero?

"R.   No, no lo sé.

"P.   ¿Ni ella le dijo?

"R.   Ni ella me lo dijo.

"P.   ¿Y cuánto le dijo que necesitaba?

"R.   Pues la cantidad que yo he dicho, y las cantidades que están en los cheques.

"P.   ¿Primero fué a verla y le dijo que necesitaba mil sesenta y dos dólares?

"R.   Sí, señor.

"P.   ¿Y después?   ¿Como cuánto tiempo después fué la segunda vez?

"R.   En el mismo mes de agosto.

"P.   ¿Entonces, primero mil sesenta y dos?

"R.   Sí señor.

"P.   ¿Y la tercera vez le dijo que necesitaba . . . ?

"R.   Quinientos.

"P.   ¿Le dijo que necesitaba quinientos dólares?

"R.   Sí, señor.

"

"P.   ¿Y usted dice que en ocasiones anteriores usted le había prestado dinero a Carmen Torres?

"R.   Sí, señor.

"P.   ¿Recuerda usted, en esas ocasiones en que le prestó dinero a Carmen Torres, para qué ella lo quería?

"R.   No.   Yo sé que era una mujer de negocio, y era responsable.

"P.   ¿Usted no le cobraba intereses a Carmen Torres por el dinero que le prestaba?

"R.   No.

"P.   ¿Usted sabe por cuánto usted demandó a Carmen Torres aquí?

"R.   Por la cantidad de los cheques—por lo que ella me debía a mí.

"P.   Vamos a ver: usted ha dicho dos cosas distintas.   ¿Por la cantidad de los cheques o por lo que ella le debía?

"R.   Por lo que ella me debía a mí.

"P.   ¿No fué por la cantidad de los cheques, según usted dijo primero?

"R.   Por lo que me debía a mí, caballero.

"P. Usted primero dijo, 'por la cantidad de los cheques.' ¿ . . . . . . . ?

"R. Bueno . . .

"P. ¿Eso es verdad o no es verdad?

"R. Por la cantidad, por la cantidad—por la cantidad será toda de los cheques, o lo que sea. Yo la demandé por lo que ella me debía a mí.

"P. ¿Y cuánto le debía ella a usted?

"R.   .      .      .      .      .      .      .

"P. ¿Usted sabe? Los ahorros de su vida. ¿Cuánto era? Dígame.

"R.   .      .      .      .      .      .      .

"P. No mire a su abogado. Míreme a mí.

"Demandante: No, si no me mira a mí. Mira el papel.

"Demandada: Pero si ella necesita el papel que lo diga, y se lo mostraré.

"Testigo:

"R. Yo la demandé a ella por lo que ella me debía a mí; por lo que mi abogado lo hizo.

"P. ¿Y cuánto le debía ella a usted?

"R. Cuatro mil y pico de pesos.

"P. ¿El pico no lo recuerda?

"R. Trescientos, algo así.

"P. ¿No sabe si por cuatro mil trescientos o por cuatro mil ochocientos?

"R. Por lo que ella me debe a mí, por lo que ella a conciencia sabe que me debe.

"P. Ahora ¿los cheques esos que usted identificó, cuándo se los entregó Carmen Torres a usted, más o menos, cuándo, en qué ocasión?

"R. ¿Que ella me los entregó a mí?

"P. Sí.

"R. En agosto último.

"P. ¿El último día de agosto?

"R. Sí, señor.

"P. Es decir, después que usted le había entregado a Carmen las tres cantidades de dinero?

"R. Después. Porque yo confiaba en ella.

"P. ¿Y cuando ya vencieron las tres cantidades . . .— ¿verdad?

"R. Sí.

"P.    — . . . ¿entonces ella le entregó a usted tres. cheques?

"R.    Sí, señor.

"P.    ¿Y cuando usted le fué entregando cada cantidad de dinero, el recibo que ella le dió entonces, lo tiene?

"R.    No.    Ella a mí no me daba recibo.    Yo se lo daba por amistad a ella.    Yo era muy amiga de ella.

"P.    ¿Por amistad y sin recibo?

"R.    Sí, señor.

"P.    Entonces explíqueme otra vez.    ¿Por qué estaban esos cheques por una suma distinta a la que usted había entregado?

"R.    .        .        .        .        .        .        . ' ' .        .

"P.    Explíqueme por qué fué eso así.    ¿O usted no sabe?

"R.    .        .        .        .        .        .        .        .        .

"P.    ¿Por qué cada uno de esos cheques estaba librado por una cantidad distinta a la que usted le había entregado a Carmen Torres?

"R.    Ah, ella me los entregó así.    Me dictó que le restara una cantidad.    Tan es así que en el papel está.

"P.    ¿Que ella le dictó que le restara qué?

"R.    Una cantidad.

"P.    ¿Una cantidad a los cheques?

"R.    Sí.

"P.    ¿Cuándo le dictó eso?

"R.    En esa época.

"P.    ¿Cuando le entregó los cheques?

"R.    Sí.

"P.    ¿Así fué?

"R.    Sí.

"P.    ¿Y ese otro papel que usted identificó . . . .?

"Demandada: Elimínese la primera parte de esa pregunta.

"P.    Dígame, señora ¿usted entonces no sabe por qué los cheques eran por una cantidad mayor que la que usted entregó, verdad?

"R.    No sé.

"P.    ¿No sabe?

"R.    No.

"P.    ¿No se explica por qué?

"R.    No.

"P.    Ahora le voy a mostrar la identificación número 1 de la demandante a ver si viendo ese documento usted nos puede explicar el por qué de la diferencia.    Mire eso y dígame ahora,

después de ver ese documento, si ahora usted sabe el porqué de la diferencia. ¿ . . . . . . . . . ?

"R.   Eso fué lo que ella me prometió a mí.   Tan es así que están descontadas, para que ella me pagara el capital de mi dinero.   Ella no me ha pagado un centavo.

"P.   Yo lo único que le estoy preguntando, señora, es si ahora usted sabe el porqué de la diferencia entre el dinero que usted entregó y el montante de cada cheque.

"R.   .        .        .        .        .        .        .        .

"Demandante: ¿Usted se refiere a esta letra?

"Demandada: Yo me refiero a la pregunta que le he hecho, que es completamente clara.   Que me explique, después de leer ese papel que ella identificó.   Ella ahora me puede decir, me puede explicar esa diferencia.

"Juez:

"—Lea el papel, señora.

"Demandante:

"—Hay otra letra, señora; léalo todo.

"Testigo:

"R.   En los cheques . . .

"Juez:

"—No en alta voz.   Usted lea el documento para sí y después contesta.

"Demandada:

"P.   ¿Me puede explicar ahora la diferencia?

"Testigo:

"R.   ¿Me puede repetir la pregunta?

"P.   Que por qué los cheques se libraron, cada uno de ellos, por una cantidad mayor a la cantidad que usted le entregó a Carmen Torres.   Usted decía que no podía explicar.   Ahora yo le pregunto si después de leer ese papelito me puede usted explicar por qué la diferencia entre cada cheque y cada entrega.   ¿Me puede explicar esa diferencia?

"R.   Ella a mí me dictó que pusiera eso.   Esta letra es de ella.   Esto no es mío.   Ella me autorizó a mí para que le descontara eso.

"P.   ¿Los números?

"R.   Son míos.

"P.   ¿Y esto que dice, "interés", "capital", eso es letra suya?

"R.   Sí, señor.

"P.   ¿Y la otra letra distinta es de Carmen Torres?

"R.   Supongo que será de ella porque mía no es.

"P.    ¿Entonces ella le prometió, dice usted, pagarle algo, no es así.

"R.    .    .    .    .    .    .    .    .    .

"P.    ¿Intereses?

"R.    *Ella me prometió llevar los cheques, y me prometió pagarme algo—sería intereses—pero yo le dije que me diera lo que me debía.    Pero ahí no hay ningún porciento—hay unas cantidades locas ahí* . . .

"P.    ¿Usted calculó las cantidades esas locas y determinó si se refieren a algún porciento?

"R.    Bueno, yo desconté lo que ella me dijo que descontara.

"P.    ¿Y entonces descontó usted lo que ella le dijo que descontara?

"R.    Pues lo que había de más en los cheques.

"P.    ¿Pero usted no dice que presentó los cheques para el cobro?

"R.    Sí.

"P.    ¿Sin descontar nada?

"R.    Sí, pero yo le iba a devolver a ella lo más que había puesto ella en los cheques.    Eso yo se lo iba a devolver a ella.

"P.    ¿Y esa idea del descuento, o la instrucción a usted para que descontara, se la dió Carmen Torres en el momento en que le entregaba los cheques?

"R.    Sí.

"P.    ¿Así fué?

"R.    Sí.

"P.    ¿No es cierto, señora Arias, que según usted le hizo cada entrega a Carmen Torres, ella le entregaba a usted un cheque . . . ?

"R.    No, no es verdad.    Ella me dió a mí los cheques el día último de agosto.

"P.    ¿—. . . con instrucciones de deducir los intereses?

"R.    Sí, que dedujera los intereses.

"Demandante: Aquí no se ha dicho que son intereses.    Aquí se ha dicho que son cantidades.

"Demandada: En el papel escrito se dice.

"Demandante: Lo dice la otra señora, pero no . . .

"Demandada: No.    En el papel escrito por ella se dice qué es interés y qué es capital.

"Demandante: Bueno . . .

"Demandada:

"P. ¿Ahora, señora, cuando los cheques fueron devueltos por no tener fondos, usted fué donde doña Carmen?

"Testigo:

"R. Sí. Yo distintas veces fuí donde ella, y ella siempre me prometió pagarme.

"P. ¿Y qué explicación le dió ella por no haber pagado en agosto 31 o en septiembre 8?

"R. Ella siempre me prometió a mí pagarme, pagarme, pagarme.

"P. ¿Pero usted no le preguntó por qué no le pagaba en el momento en que le prometió pagarle? ¿Usted no sabe qué le sucedió a ella?

"R. No sé.

"P. ¿Usted no sabe por qué ella no pudo pagarle los cuatro mil y pico de pesos?

"R. .    .    .    .    .    .    .    .

"P. Recapacite. Haga memoria un poquito.

"R. Ella siempre prometió pagarme. En ningún momento ella negó que me debiera nada. *Y así ha sucedido en las declaraciones ante el fiscal y todo.* Ella siempre lo ha aceptado.

"P. ¿Y en este caso también ha aceptado que ella le debe a usted ese dinero?

"R. Bueno, ella . . .

"P. ¿Ahora usted no sabe por qué no pudo pagarle?

"R. .    .    .    .    .    .    .    .

"P. ¿No sabe?

"R. No pagó.

"Demandante: Ahora me voy a oponer, señor juez. Que no se insista en esas preguntas, por ser ello completamente irrelevante e impertinente. Si hubiera podido pagar sí era importante. Pero al no poder pagar, por qué razón no es pertinente.

"Juez: La pregunta es si ella le había explicado por qué no le había pagado.

"Demandada:

"P. ¿Usted no sabe todavía, señora, por qué Carmen Torres no le pudo pagar? (t. 11–20)

"Testigo:

"R. No me ha explicado.

"Demandada: Nada más con la testigo."

El contrainterrogatorio de la demandada estuvo principalmente encaminado a demostrar el carácter usurario de

las operaciones realizadas entre la demandante y la demandada. El contrainterrogatorio de la demandante, arriba transcrito en su totalidad, menos en uno o dos incidentes de los abogados sobre la pertinencia de la evidencia o sobre el origen del dinero prestado por la demandante, cubre desde la página 8 hasta la página 20 de la transcripción de la evidencia. En cuanto al posible conocimiento de la demandante de las operaciones de la demandada con el señor Lopés y el señor Sierra hay alrededor de una página (t. 8–9) y una sola pregunta a la página 20. El resto de la indagación se refiere al carácter usurario de las operaciones realizadas entre la demandante y la demandada.

Pero hay algo más. Mientras informaba su caso para someterlo, el abogado de la demandada solicitó del tribunal que dilucidara en el examen judicial de la prueba, las siguientes cuestiones litigiosas:

"Ahora, señor juez, a esta altura del caso, yo quiero plantear una cuestión legal: en primer lugar, hay dos defensas técnicas, una para el caso de si Su Señoría estimara que Carmen Arias le prestó dinero a Carmen Torres. En ese caso sostenemos, primero, que la transacción es una viciada por la usura y que, por lo tanto, procedería una sentencia solamente por el setenta y cinco por ciento del capital a favor de la demandante, y el veinticinco por ciento a favor de El Pueblo.

"La segunda defensa técnica: que de proceder alguna sentencia contra la demandada, procedería en su calidad de mujer independiente, es decir, en su capacidad privativa, porque aunque se ha hecho parte demandada al marido Tomás Luff, no hay nada en la prueba de que él sancionara ni estuviera enterado siquiera de estas operaciones; y, por lo tanto, que las operaciones nada tienen que ver con la sociedad de gananciales. No se trata de compras para la familia ni de obligaciones para el sostenimiento de la familia, ya que, como se ha visto, cualquier obligación que tuviera Carmen Torres aquí, sería de ella privativamente y nunca de la sociedad conyugal. De manera que, a nuestro juicio, si Su Señoría entendiese que procede alguna sentencia en este caso contra Carmen Torres, debe limitarse ella a los bienes privativos de ella nada más.

"Esa es la cuestión legal que ahora dejamos planteada ante Su Señoría.

"Juez: La otra parte...

"Demandante: Con nuestra oposición.

"La prueba es completamente clara en cuanto a la naturaleza de los tres préstamos que le hizo la demandada Carmen Torres de Luff a la demandante Carmen Arias. En cuanto a eso, la prueba es suficiente, a la luz de los hechos que interpretamos en nuestra argumentación anterior.

"Ahora, en cuanto a la cuestión de que el marido no puede ser afectado por la sentencia, ésa es una cuestión que ha sido planteada tardíamente por el compañero. Y en ese caso, yo no tenía que traer prueba para demostrar que había asociación y anuencia entre marido y mujer en esta negociación. Si se me plantea esa cuestión a su debido tiempo, yo le presento la prueba a Su Señoría; pero como no había nada en los *pleadings,* nada tenía yo que probar en este aspecto."

Dándole crédito aparentemente a la declaración de la demandante, la primera vez que pasó sobre los hechos, la ilustrada Sala sentenciadora declaró probado el hecho que "los demandados y especialmente la demandada Carmen Torres de Luff, durante el año 1949, tomaron a préstamo a la demandante la suma de cuatro mil trescientos treinticuatro dólares ($4,334) en tres partidas de dos mil setecientos setentidós dólares ($2,772), mil sesentidós dólares ($1,062) y quinientos dólares ($500) a ser pagados el 31 de agosto de dicho año".

Tal conclusión fué en parte errónea. Como se ha visto, la demandante cuando radicó su demanda, intentó recobrar tanto el principal como los intereses usurarios de los tres cheques librados por la demandada a favor de la primera. Fué después de formulada la defensa especial de usura, que la demandante declaró, que lo que en realidad de verdad ella le prestó a la demandada, fueron $2,772, $1062, y $500 o sea la cantidad de $4,334 (t.4–5) y no los préstamos cubiertos por los cheques de $3,080, $1,195 y $530, o sea, la cantidad de $4,805 reclamada en la demanda. Su testimonio es el típico testimonio de la persona que trata de ocultar angus-

tiosamente el carácter usurario de sus operaciones. Pero en contra de su afirmación hay dos pruebas irrefutables: (1) los tres cheques librados por la demandada y aceptados por la demandante por $3,080, $1,195 y $530 y (2) una liquidación escrita, donde la propia demandante desglosa las cantidades de cada uno de los cheques de la siguiente manera: $3,080 menos $308 de intereses, igual a $2,772 de capital; $1,180 menos $118 de intereses, igual a $1,062 de capital; $530 menos $30 de intereses igual a $500 de capital. Esta prueba no fué inventada ni fabricada por la demandada. Tiene la huella de la propia mano de la demandante y la ilustrada Sala sentenciadora no podía ignorarla. Mucho menos frente a la vacilante, y a. veces increíble declaración de la demandante, en el sentido, que fué la propia demandada la que alteró las cantidades de los cheques, haciéndose responsable como prestataria de una cantidad mayor de la recibida en concepto de préstamo.

Si nuestra ley sobre intereses usurarios dispusiera la confiscación automática de todo el préstamo usurario, como debe ser en realidad de justicia, el testimonio de la demandante hubiera sido suficiente para desestimar la reclamación de la demandante. Pero la ley sólo exige la confiscación de una parte del capital prestado. Por eso al concluir que la operación realizada por las partes era una de préstamo, el tribunal ha debido pasar juicio sobre el carácter usurario o no usurario del préstamo, ya que tanto en las alegaciones como en el informe del caso, se le había llamado específicamente la atención sobre dicho aspecto de la cuestión litigiosa.

La parte demandada solicitó la reconsideración por los siguientes fundamentos:

"2. Que la sentencia en cuánto al demandado Thomas Luff se refiere, y en cuanto a la sociedad de gananciales constituída entre Thomas Luff y Carmen Torres Córdova de Luff, seguramente obedeció a alguna inadvertencia, ya que no hay indicio alguno de prueba que pueda sostener dicha sentencia.

"3. Que la sentencia en cuanto a Carmen Torres Córdova de Luff se refiere, seguramente obedeció a algún error o inadvertencia en el recuerdo que tuviera el juzgador de la prueba habida el día 5 de marzo de 1952 en el juicio celebrado en este caso, ya que la prueba que consistió de las declaraciones de la demandante y la demandada Carmen Torres Córdova de Luff está preponderantemente a favor de la demandada y en contra de la demandante.

"5. Para el caso de que el Tribunal no declarase totalmente con lugar la moción de reconsideración, los comparecientes señalan el hecho de que las conclusiones de hecho son inadecuadas a los fines de una apelación, y en particular solicitan de este Tribunal haga conclusiones de hecho sobre los siguientes particulares:

(a) Cuáles fueron las fechas exactas y las cantidades exactas de los préstamos hechos en el 1949 por la demandante a los demandados o a cualquiera de ellos.

(b) Si se convino o no se convino el pago de intereses por concepto del préstamo o préstamos y cuál fué el tipo de interés convenido.

(c) Sabía o no sabía la demandante que el dinero que le entregó a la demandada era para ser prestado a terceras personas.

(d) Actuaba o no la demandada como agente de la demandante en relación con las sumas de dinero entregadas por la demandante a la demandada.

En virtud de tal reconsideración, la ilustrada Sala sentenciadora revocó su anterior conclusión de hecho y concluyó de nuevo que: "(1) en agosto de 1949 la demandante entregó a la demandada Carmen Torres de Luff la suma de cuatro mil trescientos treinticuatro dólares, en tres partidas, con el fin de que Carmen Torres de Luff la invirtiera *prestándola a terceras personas*, cosa que hizo Carmen Torres de Luff; (2) ninguno de los demandados tomó a préstamo de la demandante la suma de cuatro mil trescientos treinticuatro dólares alegada en la demanda, según enmendada". (Se refiere a una enmienda por el resultado de la prueba.)

Empecemos por analizar en su totalidad la declaración de la demandada, a la cual parece haberle dado crédito la

ilustrada Sala sentenciadora en su segunda versión sobre los hechos.

Declaró la señora Carmen Torres Córdova de Luff, sobre el carácter de su intervención, en los siguientes términos:

R. Esas cantidades se me entregaron en tres cheques distintos. *Ellos* me llamaban por teléfono del Departamento del Interior, y yo, si no podía ir, mandaba a uno de los que trabajaban con nosotros, o con mi hermano, y ella me mandaba su libreta, con la hojita firmada, para yo misma sacar el dinero del banco. En otra ocasión fué la tía de ella y me entregaba el dinero. Yo fuí muchas veces al Departamento del Interior, cuando ella me llamaba—que tenía mucho dinero y quería prestar ese dinero.

"P. ¿No era usted la que la llamaba a ella diciéndole que usted necesitaba ese dinero?

"R. No. Yo no podía responder de ese dinero porque yo no tenía más que mi colocación *en esa fecha*—ni mi marido tampoco.

"P. ¿Y usted dice que ella quería prestar? *¿Entonces ella quería prestar por conducto de usted?*

"R. Exacto.

"P. *¿A quién?*

"R. Bueno, ella sabía que yo había prestado *en una ocasión a Lopés* porque oyó una conversación—que yo hablaba con mi hermano sobre que ellos pagaban muy buen dinero.

"P. ¿Y quién era él? ¿O ellos?

"R. Elías Lopés—Elías G. Lopés Realty Company. Elías G. Lopés era el que pagaba el dinero." (T. págs. 24 y 25.)

Sigue declarando la demandada:

"P. La demandante Carmen Arias ha dicho que con anterioridad a estas tres entregas de agosto *ella antes le había prestado dinero a usted.* ¿........?

"R. Muchas veces.

"P. Dijo que como un par de meses antes.

"R. Si, muchas veces—como desde seis o siete meses antes.

"P. *¿Y esos préstamos por qué concepto eran?*

"R. *Para ese mismo propósito*—distintas cantidades. Ella decía, 'tanto de intereses.' Y yo le consultaba a Lopés y él

decía, 'hoy yo no le puedo dar tanto; mañana puedo dar más cuanto.' Yo la notificaba a ella y ella me mandaba el dinero.

"P. ¿Qué compensación derivaba usted de esas negociaciones?

"R. Ella nunca me dió un centavo a mí.

"P. ¿Y ella recibía ganancias de esas negociaciones?

"R. Muchas.

"P. Los cheques que se presentaron en evidencia por la demandante...y le muestro el exhibit 1 a la testigo.

"R. Sí, entregados por mí . . .

"P. Un momento. Deje que le haga la pregunta—...¿cómo y cuándo entregó usted esos cheques?—

"R. Estos cheques tienen la fecha del 31 de agosto. Pero era que iban a cobrar ese dinero en esa fecha. Estos tres cheques, uno lo entregué exactamente en agosto 3 de 1949; el otro en agosto 10 de 1949, y el otro, en agosto 5 de 1949.´ El último ganaba treinta dólares de intereses en una semana nada más. Por eso es de quinientos treinta dólares; y por eso el otro es de mil ciento noventa y cinco, que ganaba...Ahí ese ganaba un poquito más del diez por ciento mensual. El otro es...

"P. ¿Qué relación tenía usted con Lopés? ¿Usted era empleada de Lopés?

"R. No.

"P. ¿Qué relación tenía usted con Lopés?

"R. Pues, sencillamente que él prestaba dinero; y alguien vino a casa un día comentando que un empleado retirado del Departamento de Auditoría había conseguido ese préstamo, que le había prestado un dinero y le había dado un buen interés. Y me dijeron que yo podía, *en una evolución que yo iba a hacer* con una casita, pues que *podía conseguir hacer algunas operaciones*. Y entonces, pues, *le recomendó a unas amigas*. Yo solamente a él lo conocía como empleado que fué de la Lotería. Ellos tenían su oficina y yo lo visité en dos o tres ocasiones. Yo sabía, también, de algunos otros amigos que tenían negocios con él. *Él siempre entregaba un documento*—que tiene que haber constancia en la oficina del licenciado Valladares—*que cuando el documento no venía a tiempo, yo daba estos cheques;* y cuando él traía el dinero en metálico—siempre, no en cheques—pues ellos venían al fin del mes en que se vencía y recogían ese dinero.

"P. ¿Por qué no se le pagó a doña Carmen Arias la suma convenida en cada uno de estos tres cheques?

"R.   Porque en esa época fué que Lopés desapareció—y ahí fué que yo perdí mi casa—por un documento que tenía la desgracia que se firmó sin garantía.   Se firmaron las escrituras por un solo documento que no tenía garantía ninguna.   Era un documento exacto al que él nos daba a nosotros cada vez que se le entregaba dinero.

"P.   ¿Pero usted dijo que desapareció Lopés?

"R.   Sí, señor.

"P.   ¿Y apareció después en algún momento y usted le ha podido cobrar ese dinero?

"R.   Sí, apareció; pero fué para celebrársele juicio después. No creo yo que nadie tratara de entrevistarse con él para tratar de cobrarle dinero.

"P.   ¿Usted ha hecho gestiones para cobrar ese dinero?

"R.   Yo tengo una demanda en la corte para tratar de cobrar los de mi casa.   Se puso esa demanda en primera instancia sobre el asunto de mi casa por una cantidad que es muy considerable y yo me quedé en la calle.   Desaparecerse él y yo quedarme en la calle fué una.   A la semana ya él había vendido la propiedad de nuevo rehipotecada.   (T. págs. 26–29.)

Contrainterrogada por el abogado de la demandante, la demandada contestó:

"P.   ¿Entonces, señora, es evidente que usted hacía muchas negociaciones con Lopés?

"R.   Sí, señor.

"P.   ¿Y usted cogía dinero de las amigas y se lo daba a Lopés?

"R.   Sí, señor.

"P.   ¿Y usted cogía dinero de las amigas y se lo daba a Lopés?

"R.   Sí.

"P.   ¿A un interés fantástico, según usted dice?

"R.   Sí."   (T. págs. 29-30).

Esta declaración deja el caso flotando en la incertidumbre en cuanto al conocimiento de la demandante de las operaciones de la demandada con el señor Lopés, punto esencialísimo para determinar la responsabilidad de la demandada. · La declaración de la demandada sobre este aspecto del caso es tan deficiente, que no pasa de una frase: *"bueno, ella sabía que*

*yo había prestado en una ocasión a Lopés,"* (t.25). No dice categóricamente que en la ocasión de los tres cheques reclamados, que es la que motiva la acción judicial que nos ocupa, la demandante supiera que el dinero prestado o entregado a la demandada fuera para el señor Lopés. Toda su declaración se caracteriza por esta elusiva forma de contestar. Cuando se le pregunta: ¿qué compensación derivaba usted de esas negociaciones?", contesta: "ella nunca me dió un centavo a mí". (t.27); pero no aclara lo que el señor Lopés hubiera podido darla, punto esencial para determinar su carácter de intermediaria. Puede ser que la demandante no le diera un centavo por su oficioso corretaje, pero puede ser que su comisión o bonificación la recibiera del señor Lopés.

Cuando se le pregunta si la demandante *le había prestado dinero a ella*, contesta "muchas veces . . . . *para ese mismo propósito*—distintas cantidades; ella decía 'tanto de intereses' y yo le consultaba a Lopés y él decía 'hoy yo no le puedo dar tanto; mañana puedo dar más cuanto'; yo la notificaba a ella y ella me mandaba el dinero". (t. 26–27).

Ya sabemos lo que la demandada hacía con el dinero *que le tomaba prestado* a la demandante. Veamos ahora, si existe alguna otra versión en la prueba sobre lo que hacía con el dinero *que no le tomaba prestado a la demandante*, sino que ella entregaba como una simple intermediaria, según las alegaciones, o como una simple mandataria, según la teoría del caso anunciada durante la vista. Cuando se le pregunta por su abogado: "y usted dice que ella quería prestar entonces, ella quería prestar por conducto suyo?", contesta "exacto". Cuando se le pregunta a continuación: "¿A quién?," contesta: *"bueno, ella sabía que yo había prestado en una ocasión a Lopés,* (t.25)."· Fuera de esta frase vaga, lo único que hemos encontrado en la transcripción de la evidencia que pudiera tener alguna relación con el carácter de intermediaria o mandataria de la demandada es otra frase suelta que dice así: "y me dijeron que yo, en una evolución que yo iba a hacer con una casita, pues que podía conseguir hacer algunas

operaciones; *y entonces, pues, lo recomendé a unas amigas"*.
No se explica para qué se lo recomendó a unas amigas: si
para que dichas amigas hicieran operaciones directamente con
el señor Lopés o para que las hicieran por mediación de ella.
Tampoco se aclara si las operaciones se harían con el dinero
de la casita de la demandada o el dinero de las amigas de ésta.

En cuanto a los cheques librados por la demandada que
representaban el dinero prestado más los intereses, según la
prueba de la demandante, la teoría de las alegaciones de la
demandada era que "la demandante le exigió como recibos por
dicha cantidad de dinero a la demandada Carmen Torres
Córdova de Luff unos cheques que fueran única y exclusiva-
mente sustitutos de recibos pero no cheques a presentarse y
cobrarse, *ya que a la demandante le constaba que la deman-
dada no tenía cuentas en el banco para honrar dichos cheques.*"
La prueba demostró que la demandada sí tenía cuenta en el
banco, pero que los cheques fueron devueltos por falta de
fondos suficientes, (*exhibit* 1). La misma demandada de-
claró que ella entregó dichos cheques a la demandante el 3 de
agosto de 1949, el 5 de agosto de 1949 y el 10 de agosto de
1949, para vencer todos el 31 de agosto de 1949, (t. 27). La
razón por la cual la demandada entregaba los cheques, declara
ella misma es que: "Él [Lopés] siempre entregaba un docu-
mento . . . que cuando el documento no venía a tiempo, yo daba
estos cheques". No se dice a quién entregaba el señor Lopés
tal documento, si a la demandante o a la demandada y nada
hay en la transcripción que demuestre que en el caso de los
tres cheques objeto de la acción, la demandante o la deman-
dada recibieran del señor Lopés los documentos. Es más, *no
hay evidencia que la demandada le entregara al señor Lopés
las cantidades que ella había recibido de la demandante.* Su
testimonio describe la práctica que se seguía pero no especifica
lo que se hizo con las tres cantidades que en agosto del 1949 le
entregó la demandante. Si él siempre daba un documento
cuando recibía dinero y esta vez no dió el documento, es posi-
ble la inferencia que no recibió los dineros. Sin embargo, la

demandada admite que recibió los dineros de la demandante y que libró los tres cheques a favor de la demandante. Para poder establecer la relación de mandataria gratuita o de intermediaria oficiosa que alegó y pretendió probar la demandada, *el hecho de que ella entregó directamente al señor Lopés los fondos de la demandante ha debido establecerse en la prueba de una manera incontrovertible.*

Cuando toda esta situación se examina con tranquilidad, sin perjuicio contra la presunta usurera ni simpatía en favor de la posible intermediaria, lo que demuestra la evidencia es que estamos frente a una simple operación de refinanciamiento de dinero; la demandante le prestaba a la demandada, la demandada al señor Lopés y el señor Lopés a sus clientes, este último *a un interés fantástico* (T. pág. 30). Los elementos subconscientes de la veracidad poco a poco se van imponiendo sobre los elementos conscientes de la improvisación.

¿Por qué la demandada estaba obligada a dar esos cheques? Partiendo de la base que su intervención en este caso, era la de una intermediaria oficiosa, como pretendió establecer la demandada en sus alegaciones, no tenía obligación alguna de darlos, puesto que ella no quedaba obligada a nada, ni con respecto a la prestamista ni con respecto a la prestataria. Pero la frase de la propia demandada "que cuando el documento no llegaba a tiempo yo daba estos cheques", implica que esos cheques constituían una garantía propia de la intermediaria hasta que el documento comprado por ella, llegara a manos de la prestamista. Nada hay en la prueba que demuestre que en este caso, los documentos expedidos por el señor Lopés, fueran entregados por la demandada a la demandante, para descargar su responsabilidad de intermediaria.

Partiendo de la base que la intervención de la demandada en este caso era la de una mandataria gratuita, como pretendió establecer la demandada en la teoría de su prueba, la frase "quería prestar por conducto suyo", más declarada por el abogado de la demandada que por ella, no resulta suficiente en

derecho para establecer un mandato. La forma práctica de determinar jurídicamente si una persona ha actuado en representación de otra, es considerar, si la persona que ha recibido el servicio o la cosa, queda obligada con el mandante en alguna forma. No hay posible forma de determinar con la prueba que tuvo ante sí la ilustrada Sala sentenciadora, si el señor Lopés quedó obligado en favor de la demandante o de la demandada. Tal como presenta el caso la prueba, parece que lo que ocurrió es que después de recibir el dinero, el señor Lopés desaparece, sin otorgar documento de clase alguna, puesto que la demandada no puede recoger los cheques que entregaba mientras el señor Lopés, a su vez, entregaba el documento.

Pero vamos a suponer que en la prueba existieran los elementos jurídicos del mandato y que la misma fuera suficiente para determinar la presencia jurídica de la voluntad ausente que supone el mandato. ¿Por el hecho de tener autoridad para prestar por su conducto, puede considerarse terminada la responsabilidad de una mandataria por el simple hecho de que el prestatario desapareciera con el dinero? Para ello tendría que demostrar que está exenta de todo dolo o culpa.

El art. 1617 del Código Civil de Puerto Rico dispone que "el mandatario es responsable, no solamente del dolo, sino también de la culpa". Asumiendo como lo más favorable a la tesis contraria, que la demandada no hubiera incurrido en dolo, ¿estaría exenta de culpa? La culpa es la falta de diligencia en el desempeño de la misión confiada: 11 Manresa 537, (ed. del Instituto Editorial Reus de 1950). En la ejecución del mandato ha de arreglarse el mandatario a las instrucciones del mandante y a falta de ellas, hará todo lo que según la naturaleza del negocio haría un buen padre de familia, dispone el art. 1610 del Código Civil de Puerto Rico. El buen padre de familia, (*bonus pater familias*), es "el hombre avisado y prudente en la dirección de sus propios negocios", (glosa anterior de Manresa). Tal diligencia se le exige lo mismo al mandatario gratuito que al mandatario remunerado.

¿Qué prueba de diligencia demuestran los autos en este caso? Ninguna. Cuando se le pregunta a la demandada: ¿por qué no se le pagó a doña Carmen Arias la suma convenida en cada uno de esos tres cheques?", contesta: "porque en esa época fué que Lopés desapareció, y ahí fué que yo perdí mi casa", (t. 28). No hay la más mínima prueba de que antes de entregar el dinero de la demandante, la demandada obtuviera el documento que el señor Lopés entregaba; no hay la más mínima prueba de las medidas adoptadas por la mandataria para cumplir fielmente con las instrucciones de su mandante. Cuando se le pregunta: "¿usted ha hecho gestiones para cobrar ese dinero?", contesta: "Yo tengo una demanda en la corte para tratar de cobrar lo de mi casa; *se puso esa demanda en primera instancia* sobre el asunto de mi casa por una cantidad que es muy considerable, y yo me quedé en la calle; *desaparecerse él y yo quedarme en la calle fué una*", (t. 29).

Como se ve, la demandada estaba involucrada en los negocios del señor Lopés, tanto con dinero propio como con el dinero que le tomaba prestado a sus amigas. Nunca puede hacer una distinción clara sobre las veces que actuaba como prestamista directamente o como refinanciadora de los dineros prestados a ella.

A lo mejor la ilustrada Sala sentenciadora, concluyó por su cuenta, estaba frente a una simple obligación moral por lo cual la demandada no quedaba obligada. La recomendación y el consejo no constituyen obligaciones jurídicas siempre que no pasen de eso, de ser una recomendación o un consejo, por pertenecer al campo de las obligaciones morales. Pero tan pronto transgreden sus propios límites se convierten en un acto jurídico exigible entre las partes. Como bien dice Manresa en su glosa del art. 1709 del Código Civil de España, equivalente al art. 1600 del Código Civil de Puerto Rico, "el hecho moral se ha convertido en un acto jurídico". En este caso no se trataba de una simple recomendación o consejo, sino de una recomendación o consejo acompañado de una enco-

mienda para invertir fondos y para comprar un documento con dichos fondos. Es natural que la recomendación o el consejo se transformara en un mandato, de acuerdo con la propia teoría de la demandada.

Bien se tratara de un contrato innominado o atípico, de un corretaje oficioso, de una modalidad presunta del contrato de mandato, de un depósito transitorio de dinero, de un fideicomiso constructivo (entiéndase enriquecimiento injusto) o de una recomendación o consejo transformado en mandato, la demandada tenía que haber demostrado su diligencia para quedar liberada de su obligación en el presente caso.

El resultado es que la demandante se ha quedado sin causa de acción tanto contra la demandada como contra el último prestatario, y El Estado Libre Asociado de Puerto Rico, en una triple operación usuraria, expresamente aceptada por la demandada en cuanto a sus propias operaciones, se ha quedado sin la parte de capital que le corresponde en toda operación usuraria.